You were appointed under the Criminal Justice Act. I was. And we want you to know we deeply appreciate your willingness to accept the assignment. I love it so thank you. May it please the court, my name is Corey Goldensoft. I am Mr. Givens' attorney. Now this particular case has two sort of separate incidences that must be addressed today. The first is the traffic stop on October 7th of 2010. The next is the dog sniff on December 19th of 2010. Going chronologically, I'll start off with the traffic stop. This is the traffic stop where Officer Baughan stopped the vehicle because he could not read the paper registration tag in the angle of the window of the car. Now your honors, what I would submit distinguishes this case from the other sorts of Eighth Circuit Court of Appeals cases that were cited by the briefs is that in this particular case, Officer Baughan stopped the vehicle to determine if there is a violation. He did not first have an articulable reasonable suspicion before making the stop. To further distinguish it, I would utilize Sanchez. In that case, the officer was able to read everything in the paper registration tag except for the issuing state. And he stated, the officer in that case stated that because he wasn't able to read that under the circumstances, he suspected that that particular tag was not an official document. Contrast that to this case where Officer Baughan didn't articulate any sort of suspicion. He didn't say anything that despite the conditions, the fact that I wasn't able to read it led me to believe that it wasn't an official document. He simply said that because it was dark out and the angle of the window, I wasn't able to read it. Well, your honors, there's nothing suspicious about it being dark out or the angle of the window. And for these reasons, we would ask with regards to that particular incident that the court reverse the district court's ruling. Now going on to the dog sniff, your honors. This is the incident on December 19th where Officer Bieber had his canine partner go through the apartment that Mr. Gibbons was residing in. To start off, I wish to discuss United States v. Davis because if Davis is controlling then, frankly, the rest of it's sort of moot. But I would argue that Davis is not ruling under this circumstance. That's because Davis is part of the Leon progeny. And what Leon and its progeny instructs us is that if an officer's relying on some sort of, I'll call it higher authority, then we shouldn't punish the officer by when they're relying on that higher authority by excluding, by applying the exclusionary rule. Because this doesn't deter further bad police behavior. In this case, there is no indication whatsoever that Officer Bieber was somehow relying on some court precedent. Now there was the Eighth Circuit Court of Appeals case, U.S. v. Scott, that ruled that a dog sniff is not a search. However, U.S. v. Scott came down or was filed about five and a half months prior to this dog sniff. And frankly, it was still pending at the time because cert by the Supreme Court wasn't denied until about a month later after the dog sniff. And in Davis, the court says that the officer must be relying on some sort of court precedent and that reliance must be objectively reasonable. There's no indication that Bieber knew about this case, especially since it was fairly recent case. It's not... And how fairly recent is fairly recent? Two days? Two months? How long have they been out there out in the legal world such as it is? Well, Your Honor, I guess, I mean, there is no sort of bright line there, but to contrast it to the law that was in Davis, in that case, that's what the U.S. v. Belton case where the search of the occupants of a vehicle had been around for years. And it was clear that the officer... We're not talking about years in this case, right? Right. Absolutely. And so we've got a much greater span of time. And officers obviously go to CLEs or CLE type things, but there's no indication that Bieber had at any point learned about U.S. v. Scott. Now, if Davis is not controlling, we must then address the issue of whether or not this is in fact a search post Jardines. And I would submit to you, Your Honors, that it is. And in fact, I would argue that U.S. v. Scott has to be overruled at this point. And that is because I would argue that the area right outside the door... So let me... Sure. Just one quick question to go back to your previous point. You think that it's relevant what the particular officer knew about prior legal authority? I do, Your Honor. The court talks about reliance on... I thought it was objectively reasonable reliance. Your Honor, I've struggled with that concept myself. And the way I read it, I guess, is that there must be some sort of reliance. In order for there to be reliance, in my opinion, I would argue that there must be some sort of knowledge of that rule. Now, the Supreme Court does say it's objectively reasonable. So I would argue that when we determine that there is some sort of reliance, is that reliance objectively reasonable reliance. So there's no sort of skewed interpretation of that law one way or the other. It's just this... I'm not saying this very well, but there is just some sort of... The reliance would make sense under the circumstances to anybody in an objective field of view. So if you have an officer that really stays on top of things, really keeps up with legal authority, and he recognizes that a concept has fallen under legal attack and has to be on shaky grounds, that officer, according to this argument, that officer is not going to be given the same leeway, is not going to be viewed as able to rely, as opposed to an officer that knows nothing about the law, doesn't keep up with anything. So if we're going to be thinking about and talking in terms of what the particular officer knew, as opposed to what a reasonable officer is objectively charged with knowing... Well, I guess it's not so much that... It seems to be kind of a backwards argument to me. No, Your Honor. I guess I wouldn't say that. And I'm sorry if it came out unclear. I would say that under the circumstances, would it make sense that an officer would interpret, for instance, U.S. v. Scott in the way that that particular officer did interpret it? Is it objectively reasonable? Or did he have some sort of really weird interpretation of U.S. v. Scott? I guess at this point, Your Honors, I would reserve the rest for rebuttal. Very well. Ms. Williams, good morning. You may proceed. Good morning, Your Honors. Mr. Goldensoft, my name is Lisa Williams, and I am a Special Assistant United States Attorney from the Northern District of Iowa, representing the United States of America today. We don't mind if you speak up nice and loud. I will try to speak up nice and even louder. How's that, Your Honor? That's fine. I would like to start with the dog sniff issue. And obviously, the government's position is that to move to the Jardines analysis. This appears to the government to be an issue of first impression in the circuit. We were unable to locate any case analyzing any type of dog sniff post-Jardines. I would like to point out that our office did argue a case before Division III on Wednesday, Justin Davis, that involved a dog sniff, again, protected by Davis, so it was a pre-Jardines dog sniff. And the facts were slightly different. But other than these two cases, the government is not aware of any other dog sniff. What was the name of the other case? It was Justin Davis, Your Honor. Jardines certainly has changed the landscape of dog sniff law. But at the same time, the government's position is it is a fairly narrowly drawn opinion. And the court, the Jardines court, starts out by noting that when the government obtains information by physically intruding on persons, houses, papers, or effects, a search within the original meaning of the Fourth Amendment has undoubtedly occurred. And so for this search to take place, the government must intrude on the persons, the house, or the papers. In Jardines, it was intrusion on the house. When the government or when the police are present in a building, like an apartment building, or in a hotel, that intrusion is not present. When they're in the common areas, the common space, that the intrusion only happens either on the house or on the cartilage of the house. So the first way that this case is distinguishable from Jardines is that the dog and the police were present in a common area of an apartment building, not on the cartilage. Jardines also continues- Excuse me for interrupting, but you did mention that Davis case. Do you have anything to indicate that Officer Bieber wasn't relying on Davis? I don't. On Scott, I don't think- the record's silent about what Officer Bieber knew or didn't know. But I think it's important. The government takes issue with the defendant's conclusion that there's no way that Officer Bieber could have known about Scott because it's such a new case. Officer Bieber is a trained narcotics canine handler. This is what he does every day. He takes his dog to places to sniff for narcotics. And if there is a case out there saying you can do this, I think it's very likely that Officer Bieber did know about that. I can guarantee the court that when Jardines came out, prosecutors all over the country were on the phone contacting their trained narcotics canine handler saying, hey, you can't do this anymore. And so these officers stay up to date with where they can take their dog, where it is permissible, because if they're somewhere where they're not, your honor, the search is thrown out. And so it's very important that they understand the limits of where they can go and what they can do with their dog. Further, turning to the objective, subjective imposition that Davis imposes, the government believes it's an objective standard. Subjectively, what Officer Bieber knew or didn't know about the case law is irrelevant. The court asked if there was a bright line test about when, how old is too old, or how new is too new. The government's position is the day the opinion comes out, that's the bright line test. That's when the law in the circuit exists. And from that day forward, an officer is presumed to know that law. Otherwise, the district court would be required to engage in many trials over what the officer knew or didn't know, which is really would be unnecessary. It's always been construed as an objective standard, and the government believes that it should remain as an objective standard. Turning back to the Jardines, the other caveat that Jardines imposed is that the police are gathering information by physically intruding on this protected space without the explicit or implicit permission of the homeowner. And so in a situation like this one, where the police buzzed an occupant of the enter, and that occupant said, sure, and let the police in, there's explicit permission for the police to be present doing what they're doing. And because that permission exists, which it did not in Jardines, that's the other reason why Jardines does not control this case. And once the court concludes that Jardines doesn't control, then we move into the Katz analysis and whether or not there's a reasonable expectation of privacy that a person in an apartment building has as to the contents of the common hallway. And that, your honors, is pretty well settled law. There is no expectation of privacy in common areas of apartment buildings, hotels, motels. That's the Brooks opinion. And that there's also a dog sniff of these common areas does not constitute a search. That's the Scott opinion. It doesn't constitute a search because well-established law has that there's no privacy interest into smells wafting out in common areas. The smell only reveals the presence of contraband. It doesn't reveal anything else, the presence or absence of contraband, excuse me. And so this type of activity simply is not a search that is worthy of constitutional protection. And so we would argue that and we would again recognize that the court can decide this issue on Davis and doesn't have to reach the Fourth Amendment issue. But we would urge the court to reach that Fourth Amendment issue. This is certainly an issue that our officers in the Northern District of Iowa are confronted with every day in this post-Jardines world is what can I do? Where can I go? How is Jardines going to apply? And so for these reasons, we think that this is a good case for the court to provide some guidance to us on. It's sort of an advisory opinion, as it were? I don't think it's... If we can decide it on a lesser ground? You certainly can decide it on a lesser ground, Your Honor. But I wouldn't say it would be necessarily an advisory opinion. I think that the issue of whether or not a dog sniff in a common area of apartment building is going to continue. No question. I assume that it will. Yes. Perhaps the other... This issue was squarely presented to the other panel or Judge Logan's panel, do you know? It was similar to this, Your Honor. That issue there, the dog traveled on an outside sidewalk that was a common sidewalk to two doors that were outside of the apartment building. So slightly different in that it wasn't an interior hallway. I see. And that there they argued a little bit more of a curtilage argument, that that sidewalk going to the outdoor apartment buildings, even though it was shared, the defense claimed that that was curtilage and entitled to protection under Jardines. So the facts are a little bit different. But other than that, that search took place before Jardines and the government has its Davis argument there as well. I'd like to briefly address the traffic stop. The government believes that this case is distinguishable from the Winters Fourth Circuit case cited by the defendant. In this case, Officer Bonham could tell that there was probably a license plate, a paper registration tag, but he couldn't see anything about it. In this case... I'm trying to remember the... There was a hearing on that point. And I left the transcript back. Does he routinely stop everyone who has this license plate that he cannot read? He said it is his normal practice to, Your Honor. He also did say, though, that there are many times at night when he can read the license plate. Because one of the issues that the defense raises that, hey, it's night, it's dark, you could never read the plate. And he testifies, look, there are many times that I can read the plate. And sometimes what people do is they take the paper, because the law requires the plate to be visible, they take the paper, wrap it in plastic and put it in the license plate holder where it would be visible, the light shining down, and that way they comply with the law. And he says there's other times when I can read it. And what was the deficiency in this plate that he was worried about? He couldn't read it at all, Your Honor. He couldn't see what the issuing state was. He couldn't see the expiration date. Is there a legal... Is there a law that says that you have to be able to read it? There is, Your Honor. The part of the Iowa Code says it has to be visible. What is that? What's that statute? That's the 318... And I apologize. It is cited in the defendant's appendix or addendum. Well, visible at what distance? Your Honor, the law is silent on what distance. But here, the record... I see that I'm out of time. If I may continue. You may complete your statement. Thank you, Your Honor. But here, the testimony at the suppression hearing was that it wasn't visible until Officer Bonham came directly up on the car and shined his flashlight on it. So it's not a difference between 100 or 50 feet. He had to be closer than a car length could even get. Well, he couldn't read it until he shined the flashlight? That's correct, Your Honor. I mean, he saw it was a tag. He could only tell that it was a piece of paper in the back of the car. And he assumed that it would be a tag. But again, his testimony... Wasn't this at night? It was at night. It was 2 o'clock in the morning, Your Honor. So law enforcement then in this state have the right to stop every vehicle that bears a temporary tag at night? If that tag is not visible, Your Honor, yes. Well, by definition, it's not going to be visible, is it? It's not. Officer Bonham testified that there's many times at nights where the tags are visible and he does not stop those cars. Visible in the sense that he can read the writing on it? Yes, Your Honor. With the correct date and all that sort of thing? Yes, Your Honor. From his car? Yes, Your Honor. With or without his flashlight? Without his flashlight, Your Honor. And I think, again, if I may continue... I thought the statute said that the tags or plates have to be securely fastened in a place and position to be clearly visible. That's correct, Your Honor. Okay. So if it's at night, it concerns me that if the government's position is that law enforcement, based on that law, can stop every vehicle where they can't read what's on the plate or tag, even at night. And in this case, it wouldn't be every vehicle with a tag that just because it's dark out is the reason that he can't read it. Because there are ways to secure the Iowa registration tag so that it is visible at night. And Officer Bonham testified to that at the hearing, that different methods that people can use to secure their registration so that it is legible and readable by an officer in his car. But here the officer testified that he could see the paper tag. He could see the paper, but he couldn't read any part of the tag. Yes. Well, but where's the requirement that he has to be able to read it from a distance? My understanding is that the law does impose a requirement that the DOT red emblem sticker, the dealer information, the expiration date are all visible as part of that tag. Thank you. Don't believe you have much time, do you? Not a lot, Your Honor. I'm sure you put it to good use. Thank you, Your Honor. I would like to address the government's argument with regarding jardines that there's no intrusion in an apartment because there's no curtilage. I would argue that there is some amount of curtilage just right outside the door of an apartment building. Lots of people extend their home by putting their shoes out there, a welcome mat, plants. And frankly, if somebody were to come to that home, they would have to stand there in front of the apartment and knock on the door. And that's the area where I would argue is some amount of curtilage. And that's where Officer Beaver's dog, Jenks, would have had to stand. And therefore, it was an intrusion. Very well. Thank you. It's an interesting issue. That's what makes this job so interesting and yours also. The case is submitted. We will take it under consideration.